UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| WILLIAM REGADANZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:12-CV-14 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff William Regadanz appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"). (*See* Docket # 1.) Pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72-1, District Judge Theresa Springmann referred this case to the undersigned Magistrate Judge for the issuance of a Report and Recommendation. (Docket # 3.)

Having reviewed the record, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED. This Report and Recommendation is based on the following facts and principles of law.

### I. PROCEDURAL HISTORY

Regadanz applied for DIB on August 27, 2009, alleging that he became disabled one week earlier, on August 20, 2009. (Tr. 128-30, 160.) The Commissioner denied his application initially and upon reconsideration, and Regadanz requested an administrative hearing. (Tr. 67-

78.) On September 15, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Yvonne Stam, at which Regadanz (who was represented by counsel), his wife, and a vocational expert ("VE") testified. (Tr. 32-64.) On October 8, 2010, the ALJ rendered an unfavorable decision to Regadanz, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 17-25.) The Appeals Council denied Regadanz's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

Regadanz filed a complaint with this Court on January 19, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Regadanz alleges that the ALJ erred by (1) mis-classifying Regadanz's residual functional capacity ("RFC") as "light" work, rather than "sedentary" work; and (2) failing to consider the effects of his "non-severe" shoulder impairment when assigning his RFC. (Mem. in Supp. of Pl.'s Mot. for Summ. Reversal 10-13.)

## II. FACTUAL BACKGROUND[1]

### A. Background

At the time of the ALJ's decision, Regadanz was fifty-one years old and had a high school education. (Tr. 128.) His work experience included almost thirty years as a dock worker and freight handler at a trucking distribution warehouse. (Tr. 169.) He alleged in his DIB application that he was disabled due to a right knee injury. (Tr. 160.)

At the hearing, Regadanz testified that he lives in a farmhouse with his wife, who works part-time, and his two children, ages twelve and fourteen. (Tr. 35.) He is independent with his self care and performs a variety of household chores, including doing dishes and laundry. (Tr.

---

[1] In the interest of brevity, this Opinion recounts only the portions of the 424-page administrative record necessary to the decision.

37.) In a typical day, Regadanz feeds and waters his two large dogs and cleans their kennels; watches television; reads the newspaper; performs outdoor chores such as checking rodent traps and watering the flowers; goes shopping; makes quick meals; picks vegetables from his garden; drives his children to and from school and extracurricular activities; and attends his children's sporting and school events. (Tr. 37-43, 55.) He alternates between sitting and standing when performing all of these activities. (Tr. 56.)

Regadanz stated that his knee and hip pain prevent him from working full time. (Tr. 35.) He explained that his knee becomes numb and his hips start hurting if he is on his feet "for a long time" and thus he frequently needs to sit down and elevate his legs. (Tr. 35, 51, 54.) He estimated that he could sit or stand for just fifteen minutes at a time before needing to change position. (Tr. 36.) He also stated that moving from sit to stand, or vice versa, is painful. (Tr. 58.)

Regadanz said that he also had recently undergone left shoulder surgery but that he was almost "back to where [he] used to be." (Tr. 43.) He elaborated that he could not "hold anything straight out with [it]," such as a gallon of milk, but could pick up a gallon of milk from the table and lower it to the floor. (Tr. 43-44, 52-53.) Regadanz estimated that he could perform repetitive activity with his left shoulder only a "short time."[2] (Tr. 53.)

### B. *Summary of the Relevant Medical Evidence*

In July 2007, Regadanz visited Dr. Hartman due to a four-week history of right knee pain after he twisted his knee on a broken step at work. (Tr. 324.) An MRI of his knee revealed a medial meniscal tear of the posterior horn, small knee joint effusions, and mild cartilage

---

[2] Regadanz's wife also testified at the hearing, essentially corroborating his testimony. (Tr. 58-60.)

irregularities compatible with degenerative changes. (Tr. 329-30.) Upon examination in August, Regadanz had mild edema and limited range of motion; he was diagnosed with a medial and lateral meniscal tear. (Tr. 203-05.) Dr. Hartman performed an arthroscopy of Regadanz's right knee with partial medial and lateral meniscectomy and chondroplasty of the trochlear groove. (Tr. 203.) By September 18, 2007, Regadanz reported that his knee felt "almost normal." (Tr. 321.)

On March, 11, 2008, Regadanz told Dr. Hartman that he could barely walk after falling on ice and feeling something tear in his knee. (Tr. 319.) After two months of physical therapy, he still had limited range of motion in his right knee. (Tr. 247.) A November MRI of his right knee showed degenerative changes, cartilage damage, and another meniscus tear. (Tr. 283.) In December, Regadanz met with Dr. Hartman to discuss his treatment options. (Tr. 311.)

On January 5, 2009, Dr. Hartman performed a right knee arthroscopy with partial medial and lateral meniscectomy and patella, trochlear groove, and medial femoral condyle chondroplasties. (Tr. 213-15.) Two days after the surgery, Regadanz was readmitted with a deep vein thrombosis; he received treatment and was discharged two days later. (Tr. 219.)

On February 10, 2009, Regadanz began to receive physical therapy for his right knee. (Tr. 232.) In April, he reported that he felt "great." (Tr. 262.) He was discharged from therapy on June 24, 2009; at that time, he still lacked full extension of his right knee and experienced mild to moderate knee pain during work activities. (Tr. 241-42.)

On May 26, 2009, Dr. Hartman placed Regadanz on restricted duty, assigning a twenty-pound lifting restriction with no twisting, kneeling, squatting, climbing, running, or prolonged standing or walking. (Tr. 346.) On June 16, 2009, Regadanz complained of swelling and pain

4

after being on his feet for much of the day. (Tr. 293.) On June 30, 2009, Dr. Hartman documented that Regadanz's right knee felt unstable and continued his work restrictions. (Tr. 291.)

Regadanz underwent a functional capacity evaluation in July 2009. (Tr. 250-56.) The physical therapist administering the evaluation was particularly concerned with the "persistent compromise of arthrokinematics in the right knee, specifically the lack of normal motion, flexion in particular, with bending and stooping activities and the inability to extend his knee fully in normal gait." (Tr. 250.) He found that Regadanz could stand and walk up to one third of the workday, but could not stoop, kneeling, or climb ladders. (Tr. 251.) Accordingly, he concluded that Regadanz could perform work at the "light/medium physical demand level for lifting as defined by the D.O.T. dependant on volume and postural orientation requirements." (Tr. 250.)

On August 12, 2009, Dr. Hartman wrote that Regadanz's right knee was "as good as its gonna [sic] get." (Tr. 289.) Regadanz still limped and was unable to fully extend his knee. (Tr. 289.) On October 8, 2009, Dr. Lavallo, a state agency physician, reviewed Regadanz's record and concluded that he could lift twenty-five pounds frequently and fifty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance, stoop, kneel, crouch, and climb ramps or stairs; and occasionally crawl and climb ladders, ropes, and scaffolds. (Tr. 333-41.) Dr. Lavallo's opinion was later affirmed by a second state agency physician. (Tr. 341.)

In September 2009, Regadanz saw Dr. Barry Miller, his family practitioner, for left shoulder pain caused when he was pulling an auger out of a sandbar at the lake two months earlier. (Tr. 391.) He reported that he had pain when lifting his arms and when shooting a

basketball. (Tr. 364, 404.) He reported mild weakness, and his range of motion was somewhat limited; yet, he had excellent strength and normal sensation. (Tr. 363-64.) An MRI of the left shoulder showed severe tendonopathy and multiple tears (Tr. 348-49), and Dr. Miller referred Regadanz to Dr. Gregory Sassmannshausen, an orthopaedic surgeon (Tr. 363).

In October 2009, Dr. Hartman completed an "ADA Accommodation Request" form for Regadanz's employer, indicating that Regadanz could not kneel, squat, climb, or lift heavy loads with his legs. (Tr. 372-73.) Dr. Hartman further articulated that he would need a "desk job" but that "to the best of [Dr. Hartman's] knowledge one [was] not available." (Tr. 372.)

Regadanz met with Dr. Sassmannshausen in January 2010, who recommended that he undergo surgery. (Tr. 391-93.) On February 2, 2010, Dr. Sassmannshausen performed a left shoulder arthroscopy with subacromial decompression, rotator cuff repair, and biceps tenotomy (Tr. 390); Regadanz began physical therapy the following month (Tr. 375). By April 28, 2010, Regadanz had completed formal therapy, was "doing well," and demonstrated full range of motion and strength. (Tr. 387.) Dr. Sassmannshausen wrote that Regadanz was to continue his home exercise program and had "no formal restrictions, with activities as tolerated." (Tr. 387.)

In June 2010, Dr. Miller penned a letter appealing the cancellation of Regadanz's health insurance. (Tr. 408.) He wrote that Regadanz had hypertension and some cholesterol issues but was "otherwise healthy" with "no other chronic on-going healthcare problems." (Tr. 408.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On October 8, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 17-25.) She found at step one of the five-step analysis that Regadanz had not engaged in substantial gainful activity since his alleged onset date and at step two that his history of right knee arthroscopic surgery was a severe impairment. (Tr. 19.) At step three, the ALJ determined that Regadanz's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 20.)

Before proceeding to step four, the ALJ determined that Regadanz's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

> [T]he claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR [§] 404.1567(b) of the Regulations. Claimant is able to lift a maximum of twenty pounds. Claimant cannot climb. He cannot perform prolonged standing or walking and cannot stand or walk for more than two hours (cumulatively) during an eight-hour workday. He cannot perform tasks requiring running. Claimant cannot twist, kneel or squat.

(Tr. 20.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Regadanz was unable to perform his past relevant work. (Tr. 23.) At step five, the ALJ found that Regadanz was not disabled because despite the limitations from his impairments, he could still perform a significant number of jobs in the national economy, including hand folder, electrical accessory assembler, and weld inspector. (Tr. 24.) Accordingly, Regadanz's claim for DIB was denied. (Tr. 38.)

*C. The ALJ's Step-Five Finding Is Supported by Substantial Evidence*

When assigning Regandanz's RFC, the ALJ determined that he could lift twenty pounds but could not stand or walk more than two hours in a workday or run, twist, kneel, or squat. (Tr. 20.) Regadanz does not dispute these exertional limitations; his argument, rather, challenges the ALJ's determination that such limitations allow him to "perform a range of light work as defined in 20 CFR [§] 404.1567(b)."[4] (Tr. 20.) As Regadanz sees it, his two-hour standing and walking limitation restricts him to "sedentary work,"[5] which, given his age,

---

[4] "Light work" is defined as lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *5. "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5. "A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work . . . ." *Id.* The full range of light work requires noncontinuous standing or walking for approximately six hours in an eight-hour workday, with intermittent sitting during the remaining two hours. *Id.*

[5] "Sedentary work" involves lifting no more than ten pounds at a time and occasionally lifting or carrying items such as files, ledgers, and small tools. 20 C.F.R. § 404.1567(a); SSR 83-10, 1983 WL 31251, at *5. "Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are

9

education, and lack of transferable skills, causes him to be presumptively disabled under the Medical-Vocational Guidelines known as the "grids."

The grids are "a series of tables broken into separate rules which classify a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience." *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (internal quotation marks and citation omitted). "The [g]rid rules permit the Social Security Administration to take administrative notice of the existence of various classes of jobs in the national economy and their vocational prerequisites; thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, at *10 (N.D. Ill. June 13, 2011) (internal quotation marks omitted) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 200.00(a)); *see Trimiar v. Sullivan*, 966 F.2d 1326, 1332 (10th Cir. 1992) ("[T]he grids are a shortcut that eliminate the need for calling in vocational experts.").

"In other words, if the criteria of a [g]rid rule *exactly fit* a claimant's vocational factors, the rule dictates the outcome; but if no rule fits a claimant exactly, the [g]rid provides only a 'framework' or guidance for the disability determination." *Anderson*, 2011 WL 2416265, at *10 (emphasis added) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 200.00(a)); *see Trimiar*, 966 F.2d at 1332 (explaining that the grids may not be applied conclusively unless the claimant's characteristics "precisely match" the criteria of a particular grid); *Fenton v. Apfel*, 149 F.3d 908, 910 (8th Cir. 1998) (same). "If no [g]rid rule corresponds with the claimant's qualifications and limitations, the ALJ must consider supplemental evidence to reach a determination . . . [which]

---

sedentary if walking and standing are required occasionally and other sedentary criteria are met." SSR 83-10, 1983 WL 31251, at *5. Periods of standing or walking should generally not exceed two hours of an eight-hour workday, with sitting totaling approximately six hours of the eight-hour workday. *Id*.

may include a vocational expert." *Anderson*, 2011 WL 2416265, at *10 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 at § 200.00(a)); *see Fenton*, 149 F.3d at 910 ("The Secretary is required to produce vocational expert testimony concerning availability of jobs which a person with a claimant's particular characteristics can perform, if his or her characteristics do not match those in the regulations . . . .").

Here, Regadanz argues that because he cannot perform the full range of light work due to his two-hour standing and walking limitation, he, by default, falls squarely within the sedentary work classification, for which he can perform the full range of work. On that premise, he contends that the ALJ inappropriately "circumvented" the grid rules by improperly relying on the VE's testimony that he could perform a limited range of light work.

The Seventh Circuit Court of Appeals, however, has already rejected Regadanz's line of argument in a similar case, *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005). There too the claimant could stand and walk less than what is required of the full range of light work but could lift more weight than the weight required of sedentary work. *Id*. The Seventh Circuit explained in that instance that the claimant's "all-or-nothing approach" to the grids and the different exertional levels was flawed:

> The regulations do not mandate the use of the grids in all circumstances in which a claimant happens to be capable of performing a full range of work at a given minimal level. Rather, the regulations broadly specify that the grids are to be employed and a conclusion directed regarding disability when a claimant's vocational factors and RFC coincide with *all of the criteria* of a particular rule. In such circumstances, an ALJ need only line up the claimant's RFC and vocational factors in the appropriate grid table, and the grid will direct a finding of disabled or not disabled. But when a claimant does not precisely match the criteria set forth in the grids, the grids are not mandated.

*Id*. (emphasis in original) (internal quotation marks and citations omitted).

11

As in *Haynes*, Regadanz's RFC "falls somewhere between the light and sedentary exertional levels, and thus he does not match all of the criteria of the rules set forth in the grids." *Id*. That is, he could perform the twenty-pound lifting requirement of light work, which exceeds the ten-pound lifting limitation of sedentary work, but could not stand or walk as much as the definition of light work requires. Faced with this situation, the ALJ did exactly what she should have done under the regulations and Seventh Circuit case law—she relied on the VE. *See id*. (explaining that where a claimant falls between two exertional levels, the ALJ must consider the grids or use them as a framework and consult with a vocational expert); *Books v. Chater*, 91 F.3d 972, 980-81 (7th Cir. 1996) (finding that where the claimant could perform the full range of light work tasks subject to certain sitting and standing restrictions, it was proper for the ALJ to procure testimony from a vocational expert).

Indeed, following Regadanz's logic, Appendix 2 of the applicable regulations, which contains and discusses the grids, would "shoehorn the claimant into the minimum full range of work that the claimant can perform and apply the appropriate rule in the grids." *Haynes*, 416 F.3d at 628. "Instead, the grids and relevant policy statements speak in terms of *maximum* sustained work capability, so it would flout the purpose of the grids to stop short at the minimum full range of work that a claimant can perform and make a disability determination on that basis." *Id*. (emphasis added).

Accordingly, Regadanz's argument that the ALJ was required to apply the grids at step five, rather than rely on the VE's testimony, is without merit.

### D. The ALJ Sufficiently Considered Regadanz's Shoulder Condition

Next, Regadanz claims that the ALJ failed to consider his shoulder condition when

assigning the RFC. Like his first argument, Regadanz's second contention fails to warrant a remand of the Commissioner's decision.

The RFC is a determination of the tasks a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545. In doing so, an ALJ must consider the combined effect of a claimant's severe and non-severe impairments when assigning an RFC. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Clifford*, 227 F.3d at 873 (7th Cir. 2000); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000); 20 C.F.R. § 404.1523.

Here, the ALJ considered Regadanz's shoulder impairment at step two, but ultimately concluded that the impairment was "non-severe" because it did not result in more than minimal functional limitations for twelve months or longer. *See* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). In doing so, the ALJ considered that Dr. Sassmannshausen, who performed the shoulder surgery, had released Regadanz with no restrictions after observing that he had full strength and range of motion. (Tr. 19.) The ALJ then expressly articulated that she still considered Regadanz's shoulder impairment in the remaining steps of her sequential analysis. (Tr. 19-20.)

Nevertheless, Regadanz alleges that the ALJ erred by failing to specifically mention his shoulder injury *when assigning the RFC*. But that argument is baseless. To reiterate, the ALJ articulated her consideration of Regadanz's shoulder injury earlier in her decision, specifically stating that she considered it at each step of her analysis. The ALJ in this instance has done enough, as the Court is easily able to track her reasoning concerning Regadanz's non-severe shoulder impairment. *Rice v. Barnhart*, 384 F.3d 363, (7th Cir. 2004) (finding that the ALJ satisfied his "minimal duty to articulate his reasons and make a bridge between the evidence and the outcome as to his step five determination"). "There is no requirement [for] tidy packaging . . . ; we read the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished).

Not to be deterred, Regadanz criticizes the ALJ for relying on Dr. Hartman's May 2009 opinion, which predated his shoulder injury and surgery. (Opening Br. 12-13.) But in doing so, Regadanz is attempting to inappropriately shift the burden of producing evidence of disability from himself to the Commissioner. The Court is not persuaded; "[i]t is axiomatic that *the claimant* bears the burden of supplying adequate records and evidence to prove [his] claim of disability." *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis added). Regadanz's treating shoulder surgeon released him without restrictions after he exhibited full strength and motion, and Regadanz has failed to produce any other medical evidence to the contrary.[6] Therefore, Regadanz's assertion that the ALJ inadequately considered his shoulder

---

[6] To the extent Regadanz suggests that his subjective testimony of shoulder pain and limitations is in and of itself sufficient to warrant restrictions in his RFC, the ALJ found his testimony "not credible" to the extent it was consistent with the assigned RFC. (Tr. 22.) Regadanz does not challenge the ALJ's credibility finding on appeal, and therefore this argument is deemed waived. *See, e.g.*, *Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (W.D. Wis. 2008) (explaining in a social security appeal that undeveloped arguments are deemed waived (citing *Kochert v. Adagen Med. Int'l, Inc*., 491 F.3d 674, 679 (7th Cir. 2007)).

condition when assigning the RFC is unavailing.

## V.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to the counsel parties' counsel.  NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. FED. R. CIV. P. 72(b).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 13th day of November, 2012.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge